## ORAL ARGUMENT NOT YET SCHEDULED

### No. 13-7006

---

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

## CHARLES MOSELEY
## MARSHALL, JR., d/b/a PSYDA
## SOLUTIONS, *et al.*
## Appellants,

### v.

## JAMES ALLISON, *et al.*,
## Appellees.

_____

On Appeal from the United State Court
for the District of Columbia, Civil
1:10-cv-02011-RMC
Hon. Rosemary Collyer

_____

## CORRECTED BRIEF OF APPELLANT
_____

Christopher T. Nace, Esq.,      Andrew H. Brown, Esq.,
 #977865                        *Pro Hac Vice*
Paulson & Nace, PLLC            Benson, Brown, & Faucher, PLLC
1615 New Hampshire Ave, NW      822 N. Elm St., Suite 200
Washington, DC 20009            Greensboro, North Carolina 27401
Phone:  202.463.1999            Phone: 336.478.6000
Fax:   202.223.6824             Fax:   336.273.5597
ctnace@paulsonandnace.com       dbrown@bbflaw.com
*Counsel for Appellants*        *Counsel for Appellants*

June 24, 2013

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

The following list includes all parties and amici curiae who appeared inthe District Court. The listed Plaintiff-Appellant and Defendants-Appellees are parties to this appeal.

**1.  Parties and Amici**

Plaintiff-Appellantis Charles Moseley Marshall, Jr. ("Marshall")d/b/a Psyda Solutions ("Psyda"). Defendants-Appellees areJames Allison ("Allison") and The Salvation Army ("TSA").

**2.  Rulings under Review**

Plaintiff-Appellantis appealing from the order and supportingmemorandum opinion of District Judge Rosemary M. Collyer entered on December 4, 2012, grantingDefendants-Appellees' motion for summary judgment. The order and supporting memorandum opinion appear on thedistrict court's docket at entries 22 and 21 respectively. There is no citation known to Appellant.

**3.  Related Cases**

The instant case was never previously before this Court or any othercourt, other than the District Court from which this case has been appealed. Plaintiff-Appellantis not aware of any cases pending in this Court thatinvolve the same parties.

i

/s/ Christopher T. Nace_____
Christopher T. Nace, Esq. #977865
Paulson & Nace, PLLC
1615 New Hampshire Ave, NW
Washington, DC 20009
Phone:  202.463.1999
Fax:  202.223.6824
ctnace@paulsonandnace.com
*Counsel for Appellant*

# TABLE OF CONTENTS

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES** ........i

**TABLE OF AUTHORITIES** .................................................................. v

**GLOSSARY OF ABBREVIATIONS** ................................................. vii

**STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION** ........................................................................................ 1

**STATEMENT OF THE ISSUES** .......................................................... 2

**STATEMENT OF THE FACTS** ............................................................ 3

**SUMMARY OF THE ARGUMENT** ...................................................... 6

**ARGUMENT** ......................................................................................... 7

I. THE U.S. DISTRICT COURT FOR THE DISTRICT OF COLUMBIA ERRED BY GRANTING DEFENDANT-APPELLEES' MOTION FOR SUMMARY JUDGMENT BECAUSE THERE ARE GENUINE ISSUES OF MATERIAL FACT REGARDING THE MALICIOUS AND DEFAMATORY NATURE OF MAJOR ALLISON'S COMMUNICATIONS. .............................. 8

  A. THERE IS EVIDENCE THE DEFAMATORY STATEMENTS WERE MADE BY ALLISON .............................................................................. 8

  B. THE STATEMENTS ARE DEFAMATORY ............................................. 11

  C. THE QUALIFIED PRIVILEGE DOES NOT PROTECT DEFENDANTS ................................................................................................ 13

II. THE TRIAL COURT ERRRED BY GRANTING DEFENDANT-APPELLEES' MOTION FOR SUMMARY JUDGMENT BECAUSE A GENUINE ISSUE OF MATERIAL FACT EXISTS REGARDING MARSHALL'S TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS CLAIM ............................................................................................ 16

**CONCLUSION** ......................................................................................**22**

**RULE 32 CERTIFICATION**...............................................................**23**

**REQUEST FOR ORAL ARGUMENT** ............................................**24**

**CERTIFICATE OF SERVICE** ........................................................**25**

# TABLE OF AUTHORITIES[*]

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).................................................7

*Browning v. Clinton*, 292 F.3d 235 (D.C. Cir. 2002) ............................................16

*Celotex Corp. v. Catrett, 477 U.S. 317 (1986).* .......................................................7

*Genetic Systems Corp. v. Abbott Laboratories*, 691 F.Supp. 407 (D.D.C. 1988)...16

*Ingber v. Ross*, 479 A.2d 1256 (D.C. 1984) ............................................................14

*Macklin v. Robert Logan Assocs.*, 334 Md. 287, 639 A.2d 112 (1994) .................16

*Moss v. Stockard*, 580 A.2d 1011 (D.C. 1990)................................................. 11, 12

*Muir v. Navy Fed Credit Union*, 783 F.Supp.2d. 19 (D.D.C. 2010.) ............... 19, 20

*Muir v. Navy Fed. Credit Union*, 529 F.3d 1100 (D.C. Cir. 2008). .......................21

*National R.R. Passenger Corp. v. Veolia Transp. Serv., Inc.*, 592 F.Supp.2d 86

  (D.C. Cir. 2009)...............................................................................................16

*Novecon Ltd. v. Bulgarian Am. Enter. Fund*, 190 F.3d 556 (D.C. Cir. 2002).........13

*Randolph v. Beer*, 695 So.2d 401 (Fla. Dist. Ct. App. 1997) ..................................11

*Smith v. District of Columbia*, 399 A.2d 213(D.C. 1979) .......................................12

*Sorrells v. Garfinckel's, et.al.*, 565 A.2d 285 (1989) .............................................17

---

[*]Plaintiff-Appellant asks the Court to consider all authorities.  Plaintiff-Appellant relies on all sources equally.

*Thomas v. Howard*, 168 A.2d 908 (D.C. 1961).......................................................14

*Wallace v. Skadden, Arps, Slate, Meagher & Flom*, 715 A.2d 873 (D.C. 1998)....11

*Wilburn v. Robinson, 480 F.3d 1140 (D.C.Cir.2007)* ...............................................7

**Rules**
Fed. R. Civ. P. 56(a)                                                                    7

**Treatises**
Restatement (Second) of Torts § 573 (1977)...........................................................11

## GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| TSA | The Salvation Army |
| PURL | Personalized URL, one of Plaintiff-Appellant's four custom initiatives for the Salvation Army |
| FSCP | Family Store Card Program, one of Plaintiff-Appellant's four custom initiatives for the Salvation Army |
| M/A | Modeling/Analysis, one of Plaintiff-Appellant's four custom initiatives for the Salvation Army |
| CLI | Constituent Loyalty Initiative, one of Plaintiff-Appellant's four custom initiatives for the Salvation Army |
| NCV | Nation's Capital Virginia Division, one of the divisions of The Salvation Army |

## STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

The District Court of the District of Columbia had jurisdiction under D.C. Code Sec. 11-921, and by virtue of the facts that all acts and omissions complained of occurred within the District of Columbia.

This Court's jurisdiction over the appeal from the district court's order granting defendant-appellee's motion for summary judgment rests on 28 U.S.C. 1291.

The district court order was entered on December 14, 2012, and the Appellant timely filed a notice of appeal on January 10, 2013.

1

## STATEMENT OF THE ISSUES

I.   Whether the U. S. District Court for the District of Columbia erred in granting Defendants-Appellees' Motion for Summary Judgment Under Rule 56 of the Federal Rules of Civil Procedure on the grounds that there is no genuine issue of material fact for a jury to decide when asked whether accusations made via e-mail and face-to-face communications by Major Allison were malicious, defamatory statements toward Psyda.

II.  Whether the U. S. District Court for the District of Columbia erred in granting Defendants-Appellees' Motion for Summary Judgment Under Rule 56 of the Federal Rules of Civil Procedure on the grounds that there is no genuine issue of material fact for a jury to decide when asked whether Major Allison's conduct constitutes tortious interference with Psyda's business relations.

2

## STATEMENT OF THE FACTS

Charles Marshall operates PsyDa Solutions ("PsyDa") as a sole proprietorship. (A-68)  Marshall has extensive experience in direct marketing. (A-67)  He has an established business, which has serviced clients for over 11 years. (A-76)  PsyDa focuses on improving current marketing practices and/or implementing profitable media platforms. (A-68–A-69)

Beginning in 2007, The Salvation Army ("TSA"), through Dean Feener, approached PsyDa about developing a series of marketing initiatives to improve TSA's marketing efforts to enhance and expand the overall donor base and revenue as derived therein. (A-77)  As a result, Marshall, a long-time TSA donor, became intimately familiar with TSA's antiquated donor outreach initiatives and recognized TSA's need to change their dated marketing and donor communication practices. (A-69–A-71)  Feener, the son of the TSA Southern Territory's Commander (A-83), was newly hired to direct TSA's donor database communicative outreach and gave Marshall the understanding that he had authority to act on behalf of TSA. (A-97)  Feener was headquartered out of TSA's main office in Atlanta, which is the headquarters for The Southern Territory, the largest TSA territory in the United States. (A-69)  Feener did, in fact, act on behalf of TSA and paid PsyDa over $75,000 for product development as their business

3

relationship progressed.  (A-77; A-97)

Specifically, PsyDa developed four custom initiatives for the Salvation Army at Feener's request: Personalized URL ("PURL"), Family Store Card Program ("FSCP"), Modeling, Analysis ("M/A"), and the Constituent Loyalty Intiative ("CLI").  (A-70)  Feener agreed, on behalf of TSA, with Marshall to compensate PsyDa under a pricing arrangement for each initiative for his efforts. (A-74–A-75; A-100)  Relying on Feener's representation, Marshall, along with his partner, Patrick Hanrahan, invested thousands of man hours in developing these custom programs.  (A-77; A-96)  Collectively, these efforts would immediately enhance TSA's current donor communication and management programs and marketing outreach.  (A-77)  The result would be significantly increased revenue via donations.  (A-77)  Feener's decision to hire Marshall was well reasoned because earlier in the decade Marshall was instrumental in tripling TSA donations from seven to twenty-one million dollars annually.  (A-110)

At the time Marshall began these efforts, TSA was primarily using another marketing company, Grizzard Communications Group, Inc. ("Grizzard").  (A-88) Grizzard had been embedded for decades as TSA's primary marketing company. (A-88)  Marshall subsequently learned that many Salvation Army officers, such as Major James Allison had significant loyalty towards Grizzard; loyalty gained, in part, from the benefits Grizzard provided to them such as travel, accommodations,

meals at very nice restaurants, and tickets to marquee sporting events like the Masters golf tournament. (A-112) Feener believed that Grizzard used antiquated marketing methods, primarily relying on substandard direct mailing and, as a result, hired PsyDa, rather than Grizzard, to revitalize TSA's marketing efforts. (A-77)

In July 2009, after years of work, the programs were ready to be implemented throughout TSA. (A-77) Feener and another colleague, Christopher McGown, both of whom had been guiding Marshall, began facilitating the implementation of the programs. (A-70) It was at that time that these efforts drew the ire of Major James Allison, the General Secretary for the Nation's Capital Virginia Division ("NCV"). Allison began sabotaging Marshall's initiatives by badmouthing Marshall and expounding erroneously upon the new programs' minor complications. (A-73; A-78; A-115; A-117 (saying, "Almost as much fun as a trip to the dentist.")) Marshall was eventually notified of Allison's multiple defamatory remarks via email and in phone conversations with Dean Feener. (A-77–A-78) Feener was present during a meeting in which Allison accused Marshall of the appearance of giving kickbacks to Salvation Army officials, misrepresenting his support from Territorial headquarters/Feener, incompetence and accusations of making unauthorized visits to NCV commands. (A-73; A-93) As a result of these remarks and Allison's public hate for Marshall and his programs, PsyDa's

relationship with TSA, despite seven years in the making, was quickly terminated. (A-78)  The impact of Allison's remarks quickly reached TSA staff and volunteers who were instructed not to implement PsyDa's programs.  (A-127–A-128)

## SUMMARY OF THE ARGUMENT

Charles Marshall d/b/a PsyDa Solutions is seeking recovery against Defendants-Appellees for damages caused by Defendant-Appellees' defamatory statements and tortious interference with Marshall's business relations.  The District Court for the District of Columbia granted Defendants' motion for summary judgment on December 14, 2012.  Plaintiff filed a notice of appeal on January 10, 2013.

There exist issues of genuine material fact regarding the nature of the statements by the Defendant and the interference that resulted therefrom.  There are inconsistencies in statements by the Defendants and their witnesses that warrant examination by a jury.  Furthermore, the nature of Defendant Allison's comments is, based on precedent cases, sufficiently defamatory as to defeat Defendants' motion for summary judgment.

Accordingly, Plaintiff-Appellant asks the court to reverse the ruling of the district court and allow these disputes in material facts to be examined by a jury.

6

## ARGUMENT

Summary judgment is proper only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The substantive law identifies which facts are material, and a dispute "over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Moreover, a dispute over facts is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* A movant can only satisfy its burden by showing "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In the instant case, Defendant-Appellee did not meet that burden. Finally, when examining a grant of summary judgment, "[this Court] reviews the district court's grant of summary judgment *de novo,* applying the same standards as the district court and drawing all inferences from the evidence in favor of the non-movant." *Wilburn v. Robinson,* 480 F.3d 1140, 1148 (D.C.Cir.2007). This appeal relates only to the U. S. District Court for the District of Columbia's grant of summary judgment in favor of the Defendant-Appellee, and thus the applicable standard of review for all issues is *de novo*. In her opinion, Judge Collyer repeatedly makes determinations of fact in favor of the Defendant. Her decision should be reversed.

7

**I.    THE U.S. DISTRICT COURT FOR THE DISTRICT OF COLUMBIA ERRED BY GRANTING DEFENDANT-APPELLEES' MOTION FOR SUMMARY JUDGMENT BECAUSE THERE ARE GENUINE ISSUES OF MATERIAL FACT REGARDING THE MALICIOUS AND DEFAMATORY NATURE OF MAJOR ALLISON'S COMMUNICATIONS.**

**A.    THERE IS EVIDENCE THE DEFAMATORY STATEMENTS WERE MADE BY ALLISON**

In Paragraph 14 of the Complaint, Marshall alleged that Allison made the following defamatory statements about him:

> 14. Beginning in October, 2009, Allison began a course of egregious conduct by accusing, Marshall, upon information and belief,  of among other things:
>> (a) Misrepresenting support of Marshall's programs by the territorial headquarters of TSA defendants
>>
>> (b) Providing monetary kickbacks to Feener by PsyDa.
>>
>> (c) False inherent problems and "incompetence" with Marshall's "Family Store Card Program."
>>
>> (d) Unauthorized visits to commands within NCV (Nation's Capital/Virginia) Division of the TSA.

(A-147)    Using subsequently filed Declarations by Allison and Feener, the defendants argued in support of their motion for summary judgment that there was no evidence that any of these statements were ever made by Allison.  These Declarations, however, directly contradict Allison and Feener's prior deposition testimony.  Feener's deposition is instructive:

8

Q.    Did you ever hear Major Allison say anything negative about the PURL program, Mr. Marshall or Psy Da.

A.    Yes.

Q.    Tell me about that.

A.    To me directly in a meeting he indicated to me that in a meeting with him and Mr. Sears that Mr. Marshall dropped my name so many times that they were—they were kind of taken aback by the amount of times that my name was dropped in their conversation.

Q.    Are you saying that Major Allison told you that he actually had an in-person meeting with Mr. Marshall.

A.    Yes.

(A-93)  Feener reported these false statements by Allison which were designed to defame Marshall by creating the impression that Marshall was misstating his support from Territorial Headquarters/Feener.    (A-133)    Allison even acknowledges that his statement to Feener was false because he never had an in-person meeting with Mr. Marshall.  (A-132)

Feener's deposition also confirmed that Allison had improperly defamed Marshall by accusing him of making unauthorized visits to the commands within NCV:

Q. Anything else negative said by Major Allison to you about PysDa or Mr. Marshall that you recall?

A. Major Allison indicated that he thought Charlie [Marshall] had made unauthorized visits to some of his local commands.

9

(A-93)  Allison acknowledged both that this accusation was false and that it casts Marshall in a negative light.  (A-135)    Judge Collyer determined that this accusation (despite Allison's concession) could not be determined by a jury to be defamatory.  Further, while Allison acknowledged in his deposition that he made accusations of unauthorized visits by Marshall and Feener confirmed it in his deposition (A-93; A-135), they both subsequently filed Declarations denying altogether that any negative accusations on any front were ever made.  (A-8; A-18)

Likewise, both Major Allison and Dean Feener were explicit in their depositions that the accusation of the appearance of "kickbacks" was made.  At deposition, Feener said of Allison's accusation that:

"(t)he specific nature of that discussion was your name was dropped so many times that if we didn't know you better, we would have wondered if you were getting kickbacks."

(A-95)  Major Allison likewise conceded that the accusation was made:

Q: So you're not sure whether you used the word "kickback"; is that correct?  Or are you sure you used the word "kickback"?

A: Yes, I said it would appear that he may be getting some kickback.

(A-134) The Declarations by Allison and Feener subsequently contradicted their deposition testimony.  Declarations clearly cannot be used to contradict and defeat the deponents' sworn deposition testimony.  At minimum, a genuine issue of material fact exists about whether such an accusation was made.  *See, e.g.,*

10

*Randolph v. Beer*, 695 So.2d 401 (Fla. Dist. Ct. App. 1997) (holding that even disseminating an allegation of "kickbacks" as "rumors of kickbacks" was enough to allow a jury to find defamation). Finally, Marshall testified that Feener told him about the accusation of "incompetence." (A-73; A-136–A-138) As such, there is significantly more than a scintilla of evidence of each of the defamatory statements by Major Allison as alleged in the Complaint, any one of which would be enough to establish a prima facie case of defamation and should have defeated defendant's motion.

### B. THE STATEMENTS ARE DEFAMATORY

"A statement is 'defamatory' if it tends to injure the plaintiff in [her] trade, profession or community standing, or lower [her] trade, profession or community standing, or lower [her] in the estimation of the community." *Moss v. Stockard*, 580 A.2d 1011, 1025 (D.C. 1990). "If it appears that the statements are at least capable of a defamatory meaning, [then] whether they were defamatory and false are questions of fact to be resolved by the jury." *Id.* "One who publishes a slander that ascribes to another conduct, characteristics or a condition that would adversely after [her] fitness for the proper conduct of [her] lawful trade or profession…is subject to liability without proof of special harm." *Wallace v. Skadden, Arps, Slate, Meagher & Flom*, 715 A.2d 873, 878 (D.C. 1998), *quoting* Restatement (Second) of Torts § 573 (1977).

11

The D.C. Circuit has consistently held that statements, such as the ones present here, constitute defamation. *Moss v. Stockard*, 580 A.2d 1011, 1025 (D.C. 1990) (accusation that it appeared a Coach had misappropriated school funds was enough to constitute defamation); *see alsoWallace,* 715 A.2d at 878 (allegation that attorney is out of the office during normal working hours could be reasonably construed as defamation and is for the jury to determine); *see also Smith v. District of Columbia*, 399 A.2d 213, 221-222 (D.C. 1979) (finding defamation includes wrongful allegation of commission of a crime). The reality here is that any allegation of kickbacks throughout a nonprofit business like The Salvation Army is a death knell for a vendor. (A-97) Such allegations are just as severe as wrongful accusations of misconduct or poor business practices. Long-time Salvation Army employees and representatives agreed when asked at depositions that these accusations, if made, were a bad thing for Mr. Marshall's business. (A-110; A-129–A-130) Mr. Lapole worked at the Salvation Army for nearly 20 years and is also highly trained in the non-profit world. (A-109) His opinion that such an accusation is injurious certainly creates a jury issue—at minimum. Judge Collyer's finding that this is inadmissible hearsay is simply wrong—these are statements of a party opponent testified to under oath by TSA employees who heard them from Mr. Allison. Even more, Lapole testified that based on his years of work with Major Allision, that Major Allison was actually aware of the

12

defamatory nature of his accusation about Mr. Marshall's alleged kickbacks. (A-110)  The reality is that this false accusation is poisonous in the nonprofit world and naturally causes debilitating results in the industry for anyone, including Mr. Marshall.  Likewise, these other allegations of wrongdoing are very much an indictment of Mr. Marshall in his trade.  A jury could certainly conclude that, based on the facts, these allegations are false and defamatory.  Accordingly, the court erred in granting summary judgment.

## C. THE QUALIFIED PRIVILEGE DOES NOT PROTECT DEFENDANTS

Even if the privilege is implicated, it is a "qualified" privilege rather than an "absolute" one.  A qualified privilege has been repeatedly defeated in this Court upon a showing of malice or reckless disregard for the truth of a statement. *Moss*, 580 A.2d at 1026 (stating that "failure to investigate the truth of a statement may be part of or accompanied by conduct arising to the level of a reckless or callous disregard for the reputation of the subject of the statement, particularly when the nature of the statement makes reputational injury likely and the defendant is aware of its probable falsity."); *see also Novecon Ltd. v. Bulgarian Am. Enter. Fund*, 190 F.3d 556, 556 (D.C. Cir. 2002) (actual malice enough to defeat privilege is "publication with knowledge that a statement was false or with reckless disregard as to whether it was false"); *see also Thomas v. Howard*, 168 A.2d 908, 910 (D.C.

13

1961) (finding that during a business meeting an employer recklessly accused an employee of stealing which constitutes malice and defeats privilege); *see also Ingber v. Ross*, 479 A.2d 1256 (D.C. 1984) (holding qualified privilege was defeated by malice when a dentist knowingly and deliberately called another dentist a hygienist to a patient).

In this case, there is significant evidence of the reckless disregard for the truth of the statements made and impact they would have on Marshall's reputation. Despite Allison's actual knowledge of the defamatory impact of his statements, Allison acknowledges he made only a "minimal" review of the materials submitted to him by Marshall and that he did no further work. (A-132) Even more, despite Mr. Marshall's requests, Allison repeatedly refused to even meet with Marshall. (A-77) Allison's lack of investigation amounts to reckless disregard and is alone enough to defeat the qualified privilege.

However, in this case, there is even more than reckless disregard; Allison was motivated by actual malice. The content of Allison's emails makes apparent his malice towards Marshall. (A-115; A-117) Allison has previously commented about his "loyalty towards the vendor, Grizzard, in part because of the benefits that Grizzard provides to him." (A-112) These benefits to officers like Allison, who are otherwise meagerly compensated, include travel, accommodations, meals at very nice restaurants, (A-112) and tickets to marquee sporting events like that

14

Masters golf tournament, the NCAA tournament, and for Allison to see his beloved Pittsburgh Steelers.  (A-110)  Such amenities, along with Allison's admission of his loyalty to Grizzard, provide significant evidence of Allison's knowing and deliberate attempt to defame Marshall in order to destroy Grizzard's new competitor.  Like in *Ingber*, Allison's knowing and deliberate attempt to defame Mr. Marshall amounts to malice and defeats qualified immunity.

Following Allison's defamatory accusation, Marshall's name became poison throughout the Salvation Army.  (A-78; A-97)  The impact of Allison's defamation on Marshall was so pervasive that it was conveyed to various commands, including TSA volunteer Wally Kirtley in Charlottesville.   (A-127–A-128)  Marshall's ongoing business with TSA ended and his seven years of work were destroyed. Allison was in an influential position to destroy and eliminate a Grizzard competitor and he did just that. (A-111)   McGown described it in an email that Marshall was "smacked in the head with a 2 X 4."  (A-139)  As a result of Allison's conduct, Marshall was not compensated as agreed, and the district court should have denied Defendants-Appellee's motion for summary judgment as to defamation because each of the elements has been established.

## II. THE TRIAL COURT ERRRED BY GRANTING DEFENDANT-APPELLEES' MOTION FOR SUMMARY JUDGMENT BECAUSE A GENUINE ISSUE OF MATERIAL FACT EXISTS REGARDING MARSHALL'S TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS CLAIM

A claim for tortious interference with prospective economic advantage has four elements: (1) the existence of a valid business relationship or expectancy, (2) knowledge of the relationship or expectancy on the part of the interferer, (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy, and (4) resultant damage. *Genetic Systems Corp. v. Abbott Laboratories*, 691 F. Supp. 407, 422-23 (D.D.C. 1988); *see alsoMacklin v. Robert Logan Assocs.*, 334 Md. 287, 297 n.7, 639 A.2d 112 (1994).

Tortious interference with prospective economic advantage requires no written contract. Indeed, even anticipating a potential book deal (which was not yet an agreement at all) has been held sufficient to show the existence of a valid business expectancy. *Browning v. Clinton*, 292 F.3d 235, 244-45 (D.C. Cir. 2002) (reversing dismissal of claim for intentional interference with business relations against former President based on claim that press statement "hindered her ability to publish her book."); *see alsoNational R.R. Passenger Corp. v. Veolia Transp. Serv., Inc.*, 592 F.Supp.2d 86 (D.C. Cir. 2009) (where Amtrak had a "legitimate expectation of winning" the contract, this was enough to meet valid business relationship for tortious interference claim). Mr. Marshall has an even stronger

16

case than the plaintiff in *Browning*.  Marshall testified that he had an oral contract with TSA through Dean Feener.  (A-74–A-75) When asked, Feener does not deny this.  (A-91)  Feener led Marshall to believe that he had the authority to enter into the agreement.  (A-72)  TSA argues that it is so decentralized that no one, essentially, is in charge and capable of acting on TSA's behalf.  Even Allison's own emails demonstrate that TSA is far more centralized than represented here. (A-141–A-142)  Even if the jury determines at trial that this was not an enforceable agreement, there is ample evidence of the ongoing business relationship, or at a minimum a relationship sufficient to create a business expectancy, which abruptly ended as a result of Allison's otherwise tortious conduct.  (A-77–A-78; A-97)

TSA contends it cannot be liable for interfering with its own contract. However, the tortious interference claim is plead in the Complaint only against Major Allison.  The employee here, Major Allison, is separately individually liable on this claim.  *Sorrells v. Garfinckel's, et.al.*, 565 A.2d 285, 290 (1989) (determining that a jury could find the supervisor liable for tortious interference with contract if she acted to cause an employee to be fired).   This is precisely why the second claim in the Complaint is plead only against Allison individually. Allison, as established herein, tortiously interfered with Marshall's business relations by breaking up his relationship with TSA.

Further, it is untrue that Mr. Marshall cannot recover for Count 1 and Count

17

II because his damages are not speculative.  Mr. Marshall has actual damages in forms other than lost profits. Prior to the lawsuit, Dean Feener and Chris McGown made oral agreements for Marshall's services, as well as helped fund his program. (A-75)  The amounts owed to Marshall by TSA for his services under the contracts are not even lost profit damages and are in no way speculative.

TSA argues that, because other jurisdictions are reluctant to award lost profits to a new business because they are generally too speculative, Marshall cannot recover lost profits.  This conclusion is incorrect. Washington D.C. courts have never adopted such a rule.  Even if we assume Washington D.C. courts would adopt the law of other jurisdictions, Marshall's claim for lost profits is not speculative. The lost profits claim is not associated with a new business, but with a business that Marshall has conducted for over a decade. (A-67)  Beginning in 2002, PsyDa provided The Salvation Army with services including data analysis, modeling, scoring, and building databases. (A-69)  Prior to the lawsuit, Dean Feener and Chris McGown made oral agreements for Marshall's services, as well as exposed him to a wide audience within TSA and helped fund his new programs. (A-75; A-97)  These representations, coupled with Marshall's past business with The Salvation Army, show Marshall was not conducting a new business based on future bargains and the market, but expanding his past business with TSA. Marshall provided direct and logical data for calculating his lost profits for each of

18

his programs in connection with the contract and business expectation with TSA. Those data have now been placed into a report and calculated to present value by Plaintiff's designated expert, Michael Boger. (A-100)

There is much more in this case than a "reasonable estimate" required by *Muir v. Navy Fed Credit Union*, 783 F.Supp.2d. 19, 23 (D.D.C. 2010.)  In *Muir,* the plaintiff's lost profits claim was insufficient because it was based on assuming future contracts and a strong real estate market.  *See id.*(although this case does not explain the reasons why lost profits were not awarded, it states "the reasons are the same as laid out [in the case] decided concurrently with this one." *Id.*at 23.   The reasoning from that case is what is referenced below.  *Muir v. Navy Fed. Credit Union,* 744 F.Supp. 2d 145 (D.D.C. 2010)).  The plaintiff claimed lost profits for three speculative investments that she was unable to afford due to the defendant's wrongful withholding of funds. *Muir,* 744 F.Supp. 2d at 149. The court denied plaintiff's recovery of lost profits on all three investments. *Id.*at 150. For the first investment, even assuming there was an agreement to sell, plaintiff would have to turn around and to sell the property for at least $9,000 more to break even. *Id.*at 149-150.   For the second investment, plaintiff presented no evidence of an agreement to purchase the land. *Id.*at 150.   Finally, for the third investment, plaintiff purchased the property with a partner, and the evidence showed plaintiff would have purchased with the partner even if she had the bank's funds. *Id.* at 150.

19

Overall, the court found there was no "reasonable estimate" of lost profits from the three investments because plaintiff could not reasonably show the future would have been different had she been given the wrongfully withheld money. *See id.* at 149-150

Marshall's case involves lost profits substantially more established than those in *Muir*. First, lost profits in this case are not based on future bargains. While the *Muir* plaintiff had to assume successful contracts, there are oral contracts between Marshall and The Salvation Army. (A-72)  Unlike the losing plaintiff in *Muir*, Marshall does not rely upon future bargains because he already contracted for his services with The Salvation Army's representatives. (A-72)  The future would be different had he been allowed to continue, because these programs would have been completed and implemented as planned with The Salvation Army.

Second, even without a contract, the resulting damages from Marshall's lost business do not require betting on the market. Instead, an expert calculated damages based on realistic numbers provided by Marshall. (A-100)  Marshall had years of experience working with the Salvation Army providing donor analysis, modeling, scoring, and building databases. (A-69)  This experience would allow him to make a "reasonable estimate" of the numbers provided to Mr. Boger. For example, Marshall estimated the Southern Territory of the Salvation Army had around 2.5 million donors. (A-102)   This number is a reasonable estimate

20

considering he provided TSA donor analysis in the past. (A-69)  Even more, there were oral agreements to pay the amounts Marshall provided in his data to Mr. Boger. (A-74)  Based on his past experience working with The Salvation Army, the representations made by Dean Feener and Chris McGown, and the assistance with the funding of the programs by the TSA, Marshall is certainly situated to show a "reasonable estimate" of lost profits in this case.

"Whether to award lost profits . . . is a question for the jury."  *Muir v. Navy Fed. Credit Union*, 529 F.3d 1100, 1109 (D.C. Cir. 2008).  As such, the District Court's ruling should be reversed.

21

## CONCLUSION

For the foregoing reasons, Plaintiff-Appellant respectfully requests that the judgment of the District Court be reversed.

Respectfully submitted,


/s/ Andrew H. Brown_____

Andrew H. Brown, Esq., *Pro Hac Vice*
        Benson, Brown, & Faucher, PLLC
822 N. Elm St., Suite 200
Greensboro, North Carolina 27401
Phone: 336.478.6000
Fax:   336.273.5597
dbrown@bbflaw.com


/s/ Christopher T. Nace_____

Christopher T. Nace, Esq. #977865
Paulson & Nace, PLLC
1615 New Hampshire Ave, NW
Washington, DC 20009
Phone:  202.463.1999
ctnace@paulsonandnace.com

*Counsel for Appellant*


Dated: June 24, 2013.

## RULE 32 CERTIFICATION

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because:

This brief contains 4204 words, excluding the parts of the brief exemptedby Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Circuit Rule 32(a)(1).

2. This brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because:

This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2011 in 14-point Times New Roman font.

## REQUEST FOR ORAL ARGUMENT

Appellant respectfully requests oral argument.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Corrected Brief of Appellant was filed using the Court's ECF system and was served upon counsel of record via First Class Mail, addressed as follows:

John M. Wood
Attorney at Law
P.O. Box 542
Great Falls, VA 22066

This the 24th day of June, 2013.

/s/ Christopher T. Nace
Christopher T. Nace, Esq. #977865
Paulson & Nace, PLLC
1615 New Hampshire Ave, NW
Washington, DC 20009